JEANETTE CLOTILDE CLARK v. KEITH M.
BRINGS AND ANOTHER.

169 N. W. (2d) 407.

June 27, 1969—No. 41289.

*Grathwol, Ploetz & Oberhauser* and *Charles P. Carroll,* for appellant.

*Rider, Bennett, Egan, Johnson & Arundel* and *David F. Fitzgerald,* for respondents.

Heard before Knutson, C. J., and Otis, Rogosheske, Sheran, and Peterson, JJ.

PETERSON, JUSTICE.

While working as a babysitter for respondents' three young children, appellant was without warning attacked and bitten by their pet Siamese cat. She brought this action to recover for the extensive injuries which allegedly resulted, and she appeals from an order denying a new trial after the court below directed a verdict for respondents and from the judgment entered pursuant to that verdict. These alternative contentions are argued: (1) That the common-law cause of action for injuries by animals should be changed, or the statute covering injuries by dogs judicially extended, to hold owners of cats strictly liable for the acts of their pets; (2) that the evidence in this case should be held sufficient to prove a cause of action under the common law as it now stands, that is, to show that respondents' cat was dangerous and that they were aware of the fact; or (3) that re-

spondents should in any event be held liable for failing to provide appellant with a safe place to work.

■ Most of the problems in this appeal fall within the ambit of the common-law's system of distributing the costs of misbehavior by animals. The relevant cause of action in tort, sometimes called "the scienter action,"[1] which is not, at least in this jurisdiction, based on negligence (Anderson v. Anderson, 259 Minn. 412, 415, 107 N. W. [2d] 647, 649), divides animals held as property into two classes: Domesticated animals, or those *mansuetae* or *domitae naturae,* and wild beasts, or those *ferae naturae.* In the case of injury by one of the first class, the plaintiff must prove that the particular animal was abnormal and dangerous, and that its owner or harborer let it run unfettered though he actually or constructively had knowledge of its harmful propensities—knowledge usually found to have been gleaned from specific acts of the animal prior to the injury sued upon. The possessor of an animal within the second class, on the other hand, is conclusively presumed to know of the danger, so a person injured need not prove such knowledge before he can recover.

This judicial distinction between classes of animals was clearly announced, at least by dicta, as early as 1730. Rex v. Huggins, 21 Ld. Raym. 1574, 1583, 92 Eng. Reprint 518, 524. The scienter action as it has come down to us is not without its modern critics, who would apply the simpler rules of liability for negligence to some or all of the situations it covers (Williams, Liability for Animals, pp. 361 to 364; McNeely, *A Footnote on Dangerous Animals,* 37 Mich. L. Rev. 1181, 1203), but the ancient doctrine has long been given continuous approval and application in Minnesota. E. g., Fake v. Addicks, 45 Minn. 37, 47 N. W. 450; Cuney v. Campbell, 76 Minn. 59, 78 N. W. 878; Rowe v. Ehrmanntraut, 92 Minn. 17, 99 N. W. 211; Maynard v. Keough, 145 Minn. 26,

---

[1]Williams, Liability for Animals, Part Five. The name derives from a phrase in the ancient writ, "scienter retinuit," or "knowingly he has kept" a dangerous animal. Id. p. 273.

175 N. W. 891; Lavalle v. Kaupp, 240 Minn. 360, 61 N. W. (2d) 228, 40 A. L. R. (2d) 539; Anderson v. Anderson, *supra*.

█ Appellant first contends that this distinction is based on comparative economic utility, the owners of "useful" animals being somewhat protected as an encouragement to maintaining them and the owners of "useless" animals receiving no protection whatever. Although the cat may once have served rural society as a "mouser," it is argued, in modern cities it is merely a dispensable pet, the owner of which ought to be held, as would the owner of a tiger, liable for any damage it causes.

So far as this argument may be based on the relative productivity of animals, it is not well founded. It is true that the economic contribution made by certain animals has been considered by the courts in the difficult cases of animals whose tameness has seemed in doubt. Thus, holding bees to be domesticated, the court in Earl v. Van Alstine, 8 Barb. (N.Y.) 630, 636, said that "the law looks with more favor upon the keeping of animals that are useful to man, than such as are purely noxious and useless."[2] Is is also true that many of the animals which have been held to be of a harmless nature, such as milch cows (Schnell v. Howitt, 158 Ore. 586, 76 P. [2d] 1130), are obviously more economically productive and, in that narrow sense, more useful to society than are cats.

The example of the horse, however, belies the suggestion that this is the primary ground on which the common law distinguishes. The earlier cases holding this animal domesticated may have dealt with beasts which were in the productive service of man, as in Nelson v. American Ry. Exp. Co. 154 Minn. 165, 191 N. W. 405, decided in 1923 and involving a draft horse with an alleged propensity to bite any passersby. The position of the

---

[2]The same factor may be involved, though it is not explicitly mentioned, in similar holdings as to bulls, Anderson v. Anderson, 259 Minn. 412, 107 N. W. (2d) 647; Erickson v. Bronson, 81 Minn. 258, 83 N. W. 988, for instance; and rams, Oakes v. Spaulding, 40 Vt. 347, 94 Am. D. 404. See, also, Prosser, Torts (3 ed.) § 75.

horse has changed with the times, however, as perhaps has that of the cat; yet the law has continued to apply the same rules to these animals when in service only for amusement and exercise, as in Harris v. Breezy Point Lodge, Inc. 238 Minn. 322, 56 N. W. (2d) 655, decided in 1953 and involving an allegedly skittish riding horse kept at a resort.

So far as appellant's argument may proceed on any broader theory of utility, we find no basis for distinguishing between species of animals. The courts have indeed held animals *ferae naturae* to include such worthless predators as coyotes, Collins v. Otto, 149 Colo. 489, 369 P. (2d) 564; and wolves, Hays v. Miller, 150 Ala. 621, 43 So. 818; but they have made the same finding as to chimpanzees, Baugh v. Beatty, 91 Cal. App. (2d) 786, 205 P. (2d) 671; buffalo, Hansen v. Brogan, 145 Mont. 224, 400 P. (2d) 265, 21 A. L. R. (3d) 595; elephants, H. E. Butt Grocery Co. v. Perez (Tex. Civ. App.) 408 S. W. (2d) 576; and, proverbially, tigers, Rex v. Huggins, *supra*; Nichols v. Marsland, L. R. 10 Ex. 255. All of these are animals of undoubted value to society in science, education, and entertainment, on the keepers of which the law must have some reason other than uselessness for imposing a special burden of care.

A close examination of the authorities shows that the law's division of animals into those domesticated and those dangerous is based rather on "[e]xperience as interpreted by the English law." Holmes, The Common Law, p. 157. Horses, cows, and other animals have been regarded by the courts as *domitae naturae* because "years ago, and continuously to the present time, the progeny of these classes has been found by experience to be harmless, and so the law assumes the result of this experience to be correct without further proof." Filburn v. People's Palace and Aquarium Co. L. R. 25 Q. B. 258, 260. In cases where there is doubt as to the propensities of a species, rather than looking to economic utility, as in Earl v. Van Alstine, *supra,* the courts may instead admit expert testimony on the question, as in Spring Co. v. Edgar, 99 U. S. (9 Otto) 645, 25 L. ed. 487, involving deer

kept in a park. More often, however, courts simply take judicial notice of an animal's characteristics, as in one of the earliest cases, Mason v. Keeling, 12 Mod. 332, 335, 88 Eng. Reprint 1359, 1361, where the court remarked that "the law takes notice, that a dog is not of a fierce nature, but rather the contrary."[3]

"[I]t appears," moreover, "that as soon as an animal is placed in the harmless class by judicial decision, judicial notice will be taken of the fact in any future case." Williams, Liability for Animals, p. 295. In the few apposite cases, the courts have without exception explicitly held or implicitly regarded the cat as a domesticated animal, one "that is dealt with by mankind on the footing that a person may safely keep it." Clinton v. J. Lyons & Co. [1912] 3 K. B. 198, 207; Marsalis v. LaSalle (La. App.) 94 So. (2d) 120, involving, as does this case, a Siamese cat; Bischoff v. Cheney, 89 Conn. 1, 92 A. 660; Pallman v. Great A. & P. Tea Co. 117 Conn. 667, 167 A. 733; Gardner v. H. C. Bohack Co. 179 App. Div. 242, 166 N. Y. S. 476; Buckle v. Holmes [1926] 2 K. B. 125, 54 A. L. R. 89. The Buckle case was cited with approval by this court in Olson v. Pederson, 206 Minn. 415, 288 N. W. 856, which before the enactment of Minn. St. 347.22 applied this general rule to dogs. As was stated by Chief Justice Rugg in Goodwin v. E. B. Nelson Grocery Co. 239 Mass. 232, 235, 132 N. E. 51, 53: "The domestic cat is by nature ordinarily harmless and docile."

We should be most reluctant, therefore, to be the first to observe judicially in this little house pet, the cat, the "fearful symmetry" which the poet, William Blake, saw in the tiger. If the law has erred in interpreting mankind's experience with cats, or if this animal's value to society strikes an inadequate balance

[3]So also in Arizona Livestock Co. v. Washington, 52 Ariz. 591, 596, 84 P. (2d) 588, 590, the court found the burro to be, "to the common knowledge of all residents of the west, ordinarily one of the most gentle and inoffensive of animals." And in Collins v. Otto, 149 Colo. 489, 369 P. (2d) 564, the court reversed a verdict which amounted to a finding that coyotes are not sufficiently ferocious to be classed as *ferae naturae*.

against whatever damage and injury it might cause, then it is for the legislature, which can best assess the total dimension of the problem, to change the common law by statute.

■ This change, appellant asserts alternatively, has in fact been accomplished by the legislature. She argues that Minn. St. 347.22, which makes the owner of a dog liable for the bites which it might without provocation inflict on those rightfully coming near it, by necessary implication includes cats—that is, if the owner of one pet is thus to be held liable, then the same statutory policy should be applied to the owner of another.

Minn. St. 347.22 (L. 1951, c. 315, § 1) was the first statute on this subject and provides:

"If a dog, without provocation, attacks or injures any person who is peaceably conducting himself in any place where he may lawfully be in any urban area, the owner of the dog is liable in damages to the person so attacked or injured to the full amount of the injury sustained. The term 'owner' includes any person harboring or keeping a dog. The term 'dog' includes both male and female of the canine species."

Before 1951, a person bitten by a dog in Minnesota could recover only through the scienter action. Olson v. Pederson, *supra*; Maynard v. Keough, *supra;* Rowe v. Ehrmanntraut, *supra;* Cuney v. Campbell, *supra;* Fake v. Addicks, *supra.*

Whatever the theory on which this statute was enacted, its close wording would seem to preclude any extension of its severe provisions to the owners of other animals, even those others of the "leisured classes" of pets. This court has not so extended this statute in other cases, for since its enactment we have continued to apply the common law in cases involving all other beasts, including both farm animals, such as the bull in Anderson v. Anderson, *supra,* and animals kept for pleasure, such as the riding horse in Harris v. Breezy Point Lodge, Inc. *supra.* Courts in at least two other jurisdictions have likewise applied the rules

of the scienter action in cases of injuries caused by cats, even though statutes covering dogs, similar to that of Minnesota, have long been on their books. In Connecticut, the comparable statute was enacted in 1798,[4] but in Bischoff v. Cheney, *supra,* decided in 1914, and in Pallman v. Great A. & P. Tea Co. *supra,* in 1933, judgments for defendant cat fanciers were affirmed, in the absence of evidence that their pets had exhibited dangerous propensities before they injured the plaintiffs. The Massachusetts statute was passed in 1812,[5] but in Goodwin v. E. B. Nelson Grocery Co. *supra,* decided in 1921, the court overruled exceptions to a directed verdict for defendant, whose previously gentle cat had mauled the plaintiff, defendant's customer.

If the Minnesota Legislature had in 1951 intended to revise the common law as to cats in the same manner as it abolished it as to dogs, there would have been no difficulty in doing so expressly, and there would be no apparent barrier to amending the statute now. Absent legislative action, we decline to hold that Minn. St. 347.22 applies to the owners of cats.

■ We must consider, then, whether appellant made out a jury issue as to her scienter action. To prove that respondents' cat had committed prior acts of viciousness, known to them, appellant's evidence was threefold: First, the cat had once before bitten a babysitter; second, the cat had scratched several members

---

[4]Conn. Rev. Stat. 1808, Title 50, c. II, § 2 (now Conn. Gen. Stat. § 22-357), provided that "when any dog shall do any damage, either to the body or property of any person," its owner or keeper "shall pay such damages as any person or persons may have sustained by such dog." See, Basney v. Klema, 2 Conn. Cir. 538, 542, 203 A. (2d) 95, 98.

[5]Laws of Mass. 1812, c. 146, § 3 (now Mass. Ann. Laws, c. 140, § 155), provided that "the owner or keeper of any dog shall forfeit and pay to the person injured, double the amount of the damage done by such dog, to be recovered by action of trespass * * *." See, Canavan v. George, 292 Mass. 245, 246, 198 N. E. 270, 271.

of the household; and third, the cat was usually confined to the basement.[6]

The biting incident, although not without significance, is less significant than appellant would acknowledge. The babysitter who had been bitten testified that the incident occurred when she and the children were playing with the cat by pulling a spool across the basement floor on a string. The cat became excited from chasing it, she related, and inflicted a "superficial" bite on her ankle. The respondents, moreover, were not informed of this "attack" incident.

It is true that the babysitter's knowledge—if it can be regarded as knowledge—of the cat's dangerousness must be imputed to respondents. Although there is some authority for the proposition that a servant's knowledge of the propensities of his master's pet is not imputable to the master if the servant has no responsibility for the pet (e. g., Twigg v. Ryland, 62 Md. 380), it is uncontroverted in this record that the babysitter who first was bitten was in charge of the cat along with the rest of respondents' home. The case is accordingly within the general rule that her knowlege of the cat's nature was that of her employers. Brice v. Bauer, 108 N. Y. 428, 15 N. E. 695; Corliss v. Smith, 53 Vt. 532; Baldwin v. Casella, L. R. 7 Ex. 325. Nonetheless, we must hold that this sole incident, because of its particular nature,

[6]Appellant offered to prove that, upon their return home, respondents had their cat destroyed. Appellant contends that the trial court's exclusion of such evidence was prejudicial error. The general rule that "no act in the nature of repairs, improvement, substitution, or the like, done after the occurrence of an injury, is receivable as evidence of a consciousness (or, an 'implied admission'), on the part of the owner, of his negligence, connivance, or other culpability in causing the injury" (2 Wigmore, Evidence [3 ed.] § 283, p. 158) is equally applicable to this situation. Such after-the-fact action does not prove before-the-act scienter, so its exclusion was not erroneous. See, also, Morse v. Minneapolis & St. L. Ry. Co. 30 Minn. 465, 16 N. W. 358; Day v. H. C. Akeley Lbr. Co. 54 Minn. 522, 56 N. W. 243.

was as a matter of law insufficient to prove or give notice of the cat's alleged dangerous temperament.

It is true that a pet's owner need not "have notice that the animal has frequently 'broken through the tameness of his nature' into acts of aggression," and that the notice is sufficient should the animal just once "throw off the habits of domesticity and tameness, and * * * put on a savage nature." Kittredge v. Elliott, 16 N. H. 77, 81. "It is not true, as has often been stated, that 'the law allows a dog his first bite,' for if the owner has good reason to apprehend, from his knowledge of the nature and propensity of the animal, that he has become evilly inclined, the duty of care and restraint attaches." Cuney v. Campbell, 76 Minn. 59, 62, 78 N. W. 878, 879. Here, however, the testimony shows that the cat was provoked and excited by play when it inflicted the first injury, and the authorities universally hold that "[s]uch an attack is no evidence of viciousness in the animal * * * and is insufficient to render the owner liable * * *." Erickson v. Bronson, 81 Minn. 258, 259, 83 N. W. 988; Lee v. Seekins, 208 Minn. 546, 294 N. W. 842; Lawlor v. French, 2 App. Div. 140, 37 N. Y. S. 807; McHugh v. Mayor of City of New York, 31 App. Div. 299, 52 N. Y. S. 623. At best, to say that this bite "was vicious is merely conjecture," and the testimony thus cannot withstand a motion for a directed verdict. Eastman v. Scott, 182 Mass. 192, 194, 64 N. E. 968, 969.

The evidence that the cat had several times scratched respondents themselves, their children, and their other babysitters is scarcely more significant. The cat usually scratched them on their hands, it appears, when they were picking it up or playfully handling it. We would agree that it is the mere dangerousness of an animal's character, and not any intentional malevolence, which must be proved to render its owner liable—that the "propensity is vicious if it tends to harm, whether manifested in play or in anger, or in some outbreak of untrained nature which, from want of better understanding, must remain unclassified." Hill v. Moseley, 220 N. C. 485, 489, 17 S. E. (2d) 676, 678; Crowley

v. Groonell, 73 Vt. 45, 50 A. 546; Evans v. McDermott, 49 N. J. L. 163, 6 A. 653. But many of these incidents of scratching would seem necessarily to be excused as provoked, under the rule discussed *supra*; in any event, injuries of so slight a nature as those shown, unaccompanied by any indications of a propensity of the cat to cause greater harm, are inadequate to prove that it was dangerous and ought to have been caged or destroyed. Maron v. Marciniak, 165 Minn. 156, 205 N. W. 894; Goodwin v. E. B. Nelson Grocery Co. *supra*; Merkle v. Schaeffer, 80 N. J. L. 74, 76 A. 326.

Appellant relies upon evidence that respondents kept their cat confined in their basement to establish knowledge and acknowledgment by respondents that their cat was dangerous. There is indeed authority to the effect that such restraint of a pet may be proof that the animal was, as its owner knew, vicious. Frederickson v. Kepner, 82 Cal. App. (2d) 905, 187 P. (2d) 800 (involving a 75-pound police dog kept on a chain as a watchdog); Brice v. Bauer, *supra*; Warner v. Chamberlain, 12 Del. 18, 30 A. 638; Montgomery v. Koester, 35 La. Ann. 1091, 48 Am. R. 253. There is authority even to the effect that proof of such confinement is sufficient of itself to support a verdict. Davis v. Mene, 52 Cal. App. 368, 198 P. 840. The sort of confinement shown in the case at bar, however, could hardly support an inference that respondents knew of any danger from their cat. It was kept in the basement, they testified, simply to prevent its scratching their living room furniture, not to protect against attack upon people. Respondents' three children, the youngest only about 3 years old, shared with the cat a furnished basement recreation room, where many of their toys were kept and where they often played. The precautions taken to keep the cat downstairs were minimal, consisting largely of a catch on the basement door, and the restraint was not continuously effective. The trial court, in our opinion, rightly considered the whole of this evidence far too tenuous for submission to the jury.

■ Appellant, in addition to her scienter action, alleged that

respondents were negligent in failing to provide her with a safe place to work; that is, that they failed to use reasonable care to learn that they were leaving her in the company of a vicious cat. Babysitters are, of course, entitled under the common law to the same safety in working conditions as are other employees, Szep v. Robinson, 20 Wis. (2d) 284, 121 N. W. (2d) 753; and they are to be protected from dangerous animals as well as from other hazards of their employment. Flynn v. Lindenfield, 6 Ariz. App. 459, 433 P. (2d) 639. As with the scienter action, however, what this cause of action lacked is proof sufficient to go to a jury.

An employee injured by his employer's animal usually must prove, much as in the scienter action, that the employer had prior notice of the beast's vicious propensity. This requirement may be supplanted, however, by allegation and proof of some special circumstances which would in its stead have put a prudent employer on guard for his employee's safety. Finley v. Conlan, 152 App. Div. 202, 204, 136 N. Y. S. 565, 566, sustained a complaint under the safe-place-to-work rule which alleged that plaintiff employee had been furnished, for pulling his delivery wagon, a horse which "might kick if one attempted to drive it when the harness pressed upon and irritated a sore upon his breast, the existence of which was known to defendant * * *." Flynn v. Lindenfield, *supra*, held it was for a jury to determine whether the defendant employers had been negligent in failing to warn an inexperienced 15-year-old babysitter to avoid a mare protecting her foal in a corral on their ranch.[7] Somewhat similarly, in Harris v. Breezy Point Lodge, Inc. *supra*, the notice of the dangerousness of defendant's horse was thought sufficient to put a prudent stable owner on guard for the safety of an inexperienced rider, as plaintiff there was.

[7]Hays v. Anchors, 71 Ga. App. 280, 30 S. E. (2d) 646, where the petition of a domestic employee was held properly dismissed even though it alleged that defendant employer's dog was made vicious by a recent veterinary operation on its head, may perhaps be counted as contrary authority.

But in the case at bar, nothing of this sort was present to indicate that respondents' cat might, in the circumstances surrounding the employment relationship, become dangerous. Nothing had earlier happened, to respondents' knowledge, to put the cat in a foul mood. Nothing in the nature of appellant's work could have been expected to lead to injury from the cat. Appellant was an experienced babysitter and had herself once owned a cat, so it would not be unreasonable for respondents to refrain from any advice to her as to the general characteristics of such an animal. Absent proof of this sort, respondents can, under this cause of action as well, only be held liable if they had notice of their cat's temperament.

Affirmed.